UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

**CENTRAL ILLINOIS PUBLIC SERVICE COMPANY (d/b/a AMERENCIPS),**
a subsidiary of AMEREN CORPORATION,

      **Plaintiff,**

v.                                            **CASE NO. 05-cv-4140-DRH**

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION NO. 702,**

      **Defendant.**

## MEMORANDUM AND ORDER

**HERNDON, District Judge**

### I. INTRODUCTION

Now before the court is plaintiff Central Illinois Public Service Company's ("CIPS") Motion for Preliminary Injunction against defendant International Brotherhood of Electrical Workers Local Union No. 702 ("IBEW"). (Doc. 4.)  CIPS initially filed a Verified Complaint for Temporary Restraining Order ("TRO"), Preliminary Injunction and Other Relief, a Motion for Entry of a TRO, Motion for Entry of a Preliminary Injunction, and Supporting Memorandum.  (Docs. 1, 3, 4 and 5, respectively.)  IBEW timely opposed both motions.  (Doc. 9.)

In a hearing before this Court, the parties agreed to go forth with CIPS' Motion for Entry of a Preliminary Injunction, which would then render as moot CIPS'

Motion for Entry of a TRO. After the conclusion of CIPS' evidence, IBEW made an oral motion for judgment as a matter of law in favor of IBEW. After taking under advisement the parties' briefs, oral arguments, and evidence presented by CIPS at the preliminary injunction hearing, in accord with **FEDERAL RULE OF CIVIL PROCEDURE 52**, the Court finds and concludes as follows.

## II.  FINDINGS OF FACT

1.  CIPS is an Illinois corporation and public utility providing electric and gas service to residential and commercial customers throughout portions of Southern and Central Illinois. (Doc. 1, ¶ 2.)

2.  IBEW is an unincorporated association and labor organization with its principal office in West Frankfort, Illinois. (*Id*. at ¶ 3.)

3.  IBEW represents many employees, including various employees of CIPS. (*Id*.)

4.  CIPS and IBEW executed a collective bargaining agreement (the "Agreement") on March 4, 2004, effective July 1, 2003 through June 30, 2007, covering an IBEW bargaining unit of employees in the Shawnee Division of CIPS, now called Division 7. (*Id*. at ¶ 4.)

5. The Agreement between CIPS and IBEW contains a no-strike clause under Article III, § 3.01.[1] (Doc. 1, Ex. A.)[2]

6. Section 3.02[3] contains a promise from IBEW to provide adequate services if employees cease work of their own volition. (*Id.*)

7. In §§ 3.03 - 3.06, the Agreement provides a four-level dispute resolution process to resolve "any disagreement arising between [CIPS] and any employee and/or employees under this Agreement." (*Id.*) The grievance adjustment procedure culminates in arbitration at the demand of either party, pursuant to § 3.06. (*Id.*)

8. Article I, § 1.03 of the Agreement, among other things, sets forth the conditions under which CIPS may contract out work covered under the Agreement to workers not represented by IBEW. (*Id.*) However, a separate Letter of Understanding from CIPS to IBEW, dated November 1, 2003, and incorporated into the Agreement, lists various types of work excluded from § 1.03 – including spraying

---

[1] **SEC. 3.01** The services to be performed by the employees covered by this Agreement pertain to and are essential to the operation of a public utility and to the welfare of the public dependent thereon, and in consideration thereof, and of the agreements and conditions herein, to be kept and performed by the Company, and the Local Union agrees that under no conditions, and in no event whatsoever, will the employees who are members of the Brotherhood covered by this Agreement be called upon or permitted to cease or abstain from the continuous performance of the duties pertaining to the positions held by them under the Company, in accord with the terms of this Agreement, and the Company agrees on its part to do nothing to provoke interruption of or prevent such continuity of performance of said employees, insofar as such performance is required in the normal and usual operation of the Company's property, and that any differences that may arise between the above mentioned parties shall be settled in the manner herein provided.

[2] The Agreement was also marked as Plaintiff's Exhibit 1 during the Preliminary Injunction Hearing.

[3] **SEC. 3.02** Should a contingency arise where an employee and/or employees covered by this Agreement, ceases work of his or their own volition, the Local Union hereby agrees to provide the Company with proper and adequate services to enable the Company to continue operation of its properties without interruption or other injurious effect.

3

work.  (*Id.* at pp. 83-84.)

9.    CIPS hired a subcontractor, Owen Specialty Services ("OSS"), which employs non-Union workers, to spray herbicide along CIPS' utility right-of-ways and substations located throughout the Southern Illinois region.  (Doc. 5, p. 1.)

10.    Because it felt that OSS paid its employees less than area standards wages and benefits, IBEW began lawfully picketing OSS at the hotel where its employees were staying on July 14, 2005.  (Doc. 9, pp. 2-3.)

11.    On the evening of July 24, 2005, IBEW held a rally in Marion, Illinois, outside of that same hotel.  (*Id.* at 3.)

12.    On the same evening as the IBEW rally, there was a high voltage electric line failure between a CIPS' substation and the Federal Penitentiary in Marion, Illinois.  (Doc. 5, p. 2.)  Because this power outage occurred after normal working hours, CIPS was required to contact its employees through one of its dispatch centers to request they work "call-out overtime."[4]  (*Id.*; *see also* James O'Daniel Preliminary Injunction Hearing testimony [rough transcript] 100:9 through 102:6.)

13.    CIPS was unable to get any positive response to its call-outs that evening from its employees who are also IBEW members (hereinafter "IBEW members"). CIPS claimed its dispatch center made over approximately 200 calls that night (including second-attempt calls) and received either no answer, an answering machine, or refusals to work the overtime due to personal reasons.  (*See, e.g.*,

---

[4] Call-out overtime is unscheduled work required to be performed after regular hours, often of an emergency nature, such as restoring gas or electric services to CIPS customers.

O'Daniel testimony [rough transcript] 106:9 through 107:15; *see also* Neil New Preliminary Injunction Hearing testimony [rough transcript] 171:24 through 172:23.)

14. CIPS was forced to handle the emergency power outage on July 24, 2005, using its supervisors and a crew of employees who were already present working other types of overtime other than call-out. (*Id*. at p. 3; O'Daniel testimony [rough transcript] 115:13 through 116:18.)

15. IBEW members either failed to answer the telephone or declined to accept the call-out overtime work during the evening of July 25, 2005, and the morning hours of July 26, 2005, and also the evening of July 26, 2005 through the morning hours of July 27, 2005. (Doc. 5, p. 3.) CIPS claims this "mass refusal" of IBEW members to work call-out overtime was, in effect, a "boycott," intended to register a grievance on behalf of IBEW in regard to CIPS' subcontracting arrangement with OSS. (*Id*.) Again, CIPS managed to cover the call-out overtime work using a crew composed of its supervisors. (New testimony [rough transcript] 176: 7-10.)

16. On the evening of July 27, 2005, IBEW members again began responding to and accepting call-out overtime work. (*Id*.)

17. On July 25, 2005, the Industrial Relations Manager for CIPS, Charles M. Baughman, had a telephone conversation with IBEW's Business Manager, Gary Roan. (*Id.* at p. 5.) Baughman communicated his belief to Roan that the mass refusal by IBEW members to work call-out overtime on the evening of July 24th had been essentially a boycott. (*Id*.) CIPS states that Roan responded that he could not force IBEW members to accept call-out overtime they were not contractually

5

obligated to work, and that at the time, he had no one else to perform the necessary call-out overtime work.[5] (*Id.*; *see also* Charles Baughman Preliminary Injunction Hearing testimony [rough transcript] 22:19 through 23:9.)

18.   During this conversation with Roan, Baughman told Roan that CIPS would proceed to seek an injunction in court if IBEW did not comply with its obligations under § 3.02 of the Agreement. (Baughman testimony [rough transcript] 24:24 through 25:9.)

19.   Baughman followed up this conversation with a letter to IBEW, demanding either an end to the effective boycott, or that IBEW provide CIPS with replacement workers or services sufficient to permit the call-out overtime work to be adequately performed, pursuant to § 3.02 of the Agreement. (*Id.*, Ex. C, pp. 4-5.)

20.   On July 28, 2005, CIPS filed its Verified Complaint and corresponding Motion for Entry of a Temporary Restraining Order, Motion for Entry of a Preliminary Injunction and supporting memorandums. (Docs. 1-5.)

21.   In its Verified Complaint, CIPS has prayed for, among other relief, issuance of a preliminary injunction against IBEW to preserve the "status quo" by (1) ensuring IBEW ceases to call upon or permit its members to refrain from accepting call-out over time work, and (2) ensuring that IBEW ceases to violate its obligations under the Agreement to provide adequate services if there is inadequate IBEW member response to call-out overtime. (Doc. 1, pp. 8-9.)

---

[5] Note that the testimony regarding Roan's statements was **not** being offered to prove the truth of the matter asserted.

### III.  CONCLUSIONS OF LAW

1.  The Court initially heard this matter pursuant to § 301 of the Labor Management Relations Act.  **29 U.S.C. § 185(c).**

2.  As the parties have agreed during the August 12, 2005, hearing to argue CIPS' Motion for Entry of a Preliminary Injunction, the Motion for Entry of a Temporary Restraining Order is decidedly moot.  Accordingly, the Court considers CIPS' Motion for Entry of a Preliminary Injunction.  (Doc. 4.)

3.  To analyze whether a preliminary injunction is proper, the Court must first determine whether it has jurisdiction to grant injunctive relief under the Norris-LaGuardia Act, as this involves a potential labor dispute. **29 U.S.C. §104.**  If proper jurisdiction is found, then the Court must analyze whether an injunction would be proper under equitable injunction principles.

4.  The Norris-LaGuardia Act expressly prohibits a court from issuing an injunction in a case "involving or growing out of any labor dispute" to prohibit a union or union member employees from "ceases or refusing to perform any work."  **29 U.S.C. § 104.**

5.  The Supreme Court, however, has created a narrow exception to this anti-injunction policy of the Noris-LaGuardia Act, as set forth in ***Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235 (1970).**

6.  Under the holding in ***Boys Markets***, a court can use equitable remedies, such as injunctive relief, to enjoin a union from striking over a

contractually-arbitrable dispute. ***Id.* at 251-53.** Essentially, "[i]f the employer has contractually obligated itself to arbitrate a given dispute, by the same token that employer must be able to enjoin the union from striking over that dispute." ***Chicago Dist. Council of Carpenters Pension Fund v. K&I Construction, Inc.*, 270 F.3d 1060, 1064 (7th Cir. 2001).**

7. Specifically, a court must first hold that the contract between an employer and the union effectively binds both parties to arbitrate the labor dispute at issue and secondly, the court must determine that an injunction "'would be warranted under the ordinary principles of equity.'" ***Id.* (citing *Boys Markets*, 398 U.S. at 254) (internal citations omitted).**

8. As the Seventh Circuit stated in ***K&I Construction,*** "the relevant issue is not simply whether the labor action violates the collective bargaining agreement, but more specifically whether the dispute that gave rise to the labor action was also one that the parties specifically agreed would be the subject of mandatory arbitration." ***K&I Construction*, 270 F.3d at 1064;** *see also **Elevator Manufacturers' Assoc. of New York, Inc. v. Local 1, Int'l Union of Elevator Constructors*, 689 F.2d 382, 385 (2d Cir. 1982).**

9. Citing two Supreme Court opinions, the Seventh Circuit has previously illustrated its belief in why the underlying dispute must not merely be the fact that

8

union members had engaged in a strike.[6]  ***Id.* (citing to *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702 (1982) and *Buffalo Forge Co. v. United Steelworkers of America, ALF-CIO*, 428 U.S. 397 (1976)).**

10.   CIPS claims that § 3.01 of the Agreement obligates IBEW to avoid sponsoring a strike (or "boycott") and § 3.02 requires IBEW to ensure continuous performance of service for CIPS if there is such a work stoppage initiated by IBEW members.  (Doc. 5, p. 13.)  Further, CIPS argues that the "boycott" of call-out overtime work occurring on July 24 - 27, 2005, resulted in IBEW's violation of its contractual obligations under §§ 3.01 and 3.02 of the Agreement.  (*Id.*)

11.   CIPS has further alleged that IBEW strongly encouraged its members to refrain from accepting the call-out overtime during the time period at issue and also refused to supply CIPS with other workers to cover the call-out overtime work, in an effort to make known its grievance regarding the OSS contract.  (*Id.*)  These violations of the Agreement are what CIPS believes is the underlying arbitrable dispute, which should then meet the test as set forth in ***Boys Markets*** for issuing an injunction despite the prohibition under the Norris-LaGuardia Act.

12.   The Court finds that CIPS has failed to first and foremost show that

---

[6] Both Supreme Court cases involved an employer seeking an injunction to preserve the status quo of union members who had engaged in a sympathy strike for a sister union.  Ultimately, the Supreme Court determined in both cases that injunctive relief was not appropriate without finding that union and employer had contractually agreed to arbitrate the underlying grievance which prompted the sympathy strike in the first place.  ***Jacksonville Bulk Terminals,* 457 U.S. at 721-22; *Buffalo Forge*, 428 U.S. at 412-13.**

9

IBEW violated §§ 3.01 or 3.02 of the Agreement. Assuming *arguendo*, that IBEW had, in effect, encouraged a "boycott" or strike of call-out overtime work, CIPS claims that this was due to a grievance IBEW had with OSS performing spraying contract work for CIPS. (*See* Doc. 1, ¶ 6, and Doc. 5, pp. 1-3.)

13. CIPS has clearly pointed out, however, that spraying contract work is *expressly excluded* from the Agreement.[7] Therefore, it is not an arbitrable issue. As such, under the reasoning of **Jacksonville Bulk Terminals** and **Buffalo Forge**, a resulting work stoppage amounting to a strike cannot be enjoined under the Norris-LaGuardia Act, because the underlying dispute is not arbitrable.

14. If IBEW did have a grievance regarding the OSS work, it could not force CIPS to arbitrate as the CIPS/OSS spraying contract is outside of the scope of the Agreement and not subject to mandatory arbitration.

15. The Court finds that CIPS has not proven that this matter falls within the **Boys Markets** exception. In short, to issue an injunction against IBEW to preserve the status quo would go against binding precedent and therefore be improper.

16. The Court thus finds that it does not have proper jurisdiction under the Norris-LaGuardia Act to issue injunctive relief at this time.

17. The Court further finds CIPS failed to prove that IBEW violated the

---

[7] Spraying contract work, as stated *supra*, was expressly excluded from the scope of the Agreement via the Letter of Understanding, dated November 1, 2003, as incorporated by reference into the Agreement. (Doc. 1, Ex. A, pp. 83-84 or Pl.'s PI Hearing Ex. 1, p.83-84.)

Agreement in the first instance.[8]

18.   CIPS alleges that IBEW encouraged or provoked a "boycott" of its IBEW members from accepting this call-out overtime work from July 24, 2005, through July 27, 2005, in violation of § 3.01 of the Agreement and as such, CIPS suffered damages.  (Doc. 1, ¶ 6.)  Additionally, CIPS alleges that IBEW violated § 3.02 of the Agreement by not providing CIPS with additional workers to cover the call-out overtime work during the time period at issue.  (Doc. 1, ¶¶ 7, 17.)  In examining the evidence presented by the parties, the Court finds that CIPS has not met its burden of proving that either IBEW provoked the alleged strike or "boycott," or that IBEW refused to provide additional workers to cover the call-out overtime work.

19.   CIPS has conceded through witness testimony that IBEW members are not contractually obligated to accept call-out overtime.[9]  (*See* O'Daniel testimony [rough transcript] 128:12-17 and 129:2-10; New testimony [rough transcript] 175:24 through 176:6.)

20.   Under the Norris-LaGuardia Act, CIPS is required to show IBEW encouraged the alleged strike or "boycott" of call-out overtime by "clear proof of [IBEW's] actual participation in, or actual authorization of, such acts, or of

---

[8] Even though the Court has already found it does not have proper jurisdiction in which to issue injunctive relief because the underlying dispute was not an arbitrable issue, the Court feels it necessary to summarize why it finds there was no proven violation of the Agreement by IBEW.

[9] In 1993, CIPS locked-out IBEW members (IBEW Local 702) for 10 weeks in response to "inside game" tactics allegedly implemented by IBEW.  The ALJ determined that call-out overtime was not mandatory, and this finding was not disturbed by the NLRB.  **See *Cent. Ill. Pub. Serv. Co.*, 326 NLRB 928, 929 (1998)**; ***review denied* 215 F.3d 11 (D.C. Cir. 2000).**

ratification of such acts after actual knowledge thereof." **29 U.S.C. § 106;** *see also* ***Air Line Pilots Assoc., Int'l v. United Air Lines, Inc.***, **802 F.2d 886, 906, (7th Cir. 1986).**

21. Given that call-out overtime work is not compulsory, the Court finds CIPS has not presented adequate explanation of how refusing something an IBEW member is not obligated to do would be considered a strike or boycott.

22. To show evidence of provocation of the strike or "boycott", CIPS points to Baughman's telephone conversation with Roan on July 25, 2005, wherein Roan allegedly indicated to Baughman that he had told CIPS representatives there "would be a problem" if they brought in OSS to perform spraying work.  (Doc. 5, p. 5, and Ex. C, ¶ 6; *see also* Baughman testimony [rough transcript] 21:10 through 22:17.) Yet, CIPS cannot point to *one* IBEW member who refused call-out overtime work because the IBEW encouraged the member to do so.  (Baughman testimony [rough transcript] 63:12-25 and 65:16-20; O'Daniel testimony [rough transcript] 123:18-25 and 124:22 through 125:3; New testimony [rough transcript] 175:17-23; .)

23. CIPS was not able to affirmatively state that IBEW members who were unreachable by telephone were simply avoiding CIPS' call-outs.[10]

24. CIPS cannot point to any witness testimony or documentary evidence

---

[10] For example, CIPS admits during the Preliminary Injunction Hearing that there is a possibility that a popular event, using for illustrative purposes only, such examples as a high school basketball game or deer hunting season, could present a legitimate reason why a majority of IBEW members were not at home on the evenings of July 24-27. (Preliminary Injunction Hearing transcript [rough transcript] 33:9 through 35:6 and 61:25 through 62:10.)

to clearly show that IBEW had encouraged a boycott or strike of call-out overtime work during July 24-27, 2005.  Instead, CIPS relies on numbers – it presented evidence of call-out data to show the number of callouts made on each night in question and the number of responses, or lack of responses.  However, statistical evidence alone is insufficient to show any involvement on the part of IBEW in the alleged call-out overtime work boycott.  ***United Airlines*, 802 F.2d at 905-06 (The employer, United, "failed to identify even a single pilot who had taken sick leave without being actually sick," and therefore could not prove by "clear proof" using merely attendance statistics that the union was involved with or had provoked the alleged sick leave abuse issue**.).

25.    As such, the Court finds CIPS has failed to present clear evidence that IBEW did anything to provoke or encourage its members to refuse call-out overtime during July 24-27, 2005, in violation of § 3.01  of the Agreement.

26.    CIPS claims that IBEW violated § 3.02 of the Agreement by failing to provide adequate services to CIPS (i.e., other workers) to answer the call-out overtime needs during the time period in question.  (Doc. 1, ¶¶ 7, 17.)

27.    CIPS' witness, Baughman, testified that during his telephone conversation with Roan, he had requested IBEW to provide workers to perform the call-out overtime work, and Roan had told him he had no workers to provide.[11]

---

[11] Note Baughman's testimony regarding Roan's statements was **not** being offered to prove the truth of the matter asserted (as that would be objectionable hearsay), but instead offered to explain why Baughman believed IBEW was in breach of the Agreement thereby prompting CIPS to seek injunctive relief.

(Baughman testimony [rough transcript] 21:10 through 22:17.) Yet, CIPS' witness at the preliminary injunction hearing, James O'Daniel, testified that he had contacted several contractors represented by IBEW that were willing to perform the call-out overtime work, but that CIPS was able to handle the work without contracted assistance. (O'Daniel testimony [rough transcript] 131:8-24.)

28.  The Court has found that the IBEW members were not effectively "on strike" regarding the call-out overtime work during July 24-27, 2005, and thus, the requirements of § 3.02 were not triggered. Therefore, the Court further finds that IBEW would not have had a duty to provide CIPS with workers for the call-out overtime during the time period at issue.[12]

29.  Because CIPS failed to prove that IBEW was *not* able to provide workers, and also because the Court finds that IBEW did not technically have a duty under § 3.02 in this instance to provide workers, IBEW did not violate § 3.02 of the Agreement.

30.  In sum, the Court finds that it has no jurisdiction under the Norris-LaGuardia Act to issue injunctive relief in this case. The **Boys Markets** exception to the Act does not apply here, as the underlying dispute is not an arbitrable issue,

---

[12] Furthermore, although the parties to do not make issue of this point, the Court notes that the actual language of § 3.02 requires IBEW to provide workers when "a contingency arise[s] where an employee and/or employees covered by this Agreement, *ceases work of his or their own volition*." *See* The Agreement, § 3.02 (emphasis added). "Ceases work of his or their own volition" seems to indicate that the IBEW member(s) must voluntarily decide to not do work – i.e., go on strike or initiate a work stoppage. A logical interpretation of the language of § 3.02 would seem to require IBEW to provide CIPS with additional workers only when IBEW members have initiated a strike. Because the Court has determined there was no strike or "boycott" of work IBEW members were not obligated to perform, it follows that § 3.02 of the Agreement would not be triggered in this case.

14

and the ability for CIPS to subcontract spraying work to OSS would not be within the scope of the Agreement.  Further, even if the underlying dispute was arguably the alleged violation of §§ 3.01 and 3.02 of the Agreement, the Court finds that CIPS has not met its burden to show that IBEW either provoked the supposed strike or "boycott" or was unwilling to provide workers to handle CIPS' call-out overtime work.[13]

### IV.  CONCLUSION

In regard to plaintiff CIPS' Motion for Entry of a Preliminary Injunction, the Court **FINDS** in favor of defendant IBEW and against plaintiff CIPS.  Defendant's oral motion for Judgment as a matter of law pursuant to Federal Rule of Civil Procedure 52(c) at the close of Plaintiff's evidence is **GRANTED**.

**IT IS SO ORDERED.**

Signed this 24th day of August, 2005.

/s/   David RHerndon
**United States District Judge**

---

[13] Because the Court has determined it has no jurisdiction to issue injunctive relief, there is no need to analyze whether CIPS has demonstrated injunctive relief would be proper in accordance with equitable principles.